[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-11037

_____

MACHELLE JOSEPH,

                                        Plaintiff-Appellant,

*versus*

BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA,
GEORGIA TECH ATHLETIC ASSOCIATION,

                                        Defendants-Appellees,

GEORGE P. PETERSON, et al.,

                                        Defendants.

2                          Opinion of the Court                    23-11037

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-00502-VMC

_____

_____

No. 23-12475

_____

THOMAS CROWTHER,

Plaintiff-Appellee,

*versus*

BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF
GEORGIA,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia

D.C. Docket No. 1:21-cv-04000-VMC

_____

Before WILLIAM PRYOR, Chief Judge, and LUCK and ED CARNES, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

These consolidated appeals require us to decide a common question: whether Title IX of the Education Amendments of 1972 provides an implied right of action for sex discrimination in employment. Thomas Crowther, formerly an art professor at Augusta University, and MaChelle Joseph, formerly the head women's basketball coach at the Georgia Institute of Technology, filed separate complaints of discrimination and retaliation against the University System of Georgia. The Crowther appeal also presents a question about his claim of retaliation under Title IX. And the Joseph appeal requires us to decide whether her remaining claims of discrimination and retaliation under Title VII, Title IX, and the Georgia Whistleblower Act survive summary judgment. As to the common question, we conclude that Title IX does not provide an implied right of action for sex discrimination in employment. We reverse the order denying the dismissal of Crowther's claims and affirm the judgment against Joseph's complaint.

## I. BACKGROUND

We review the background of these appeals in two parts. We first describe the background of the Crowther appeal. We then address the background of the Joseph appeal.

4                    Opinion of the Court                    23-11037

*A. Thomas Crowther*

Thomas Crowther worked as an art professor at Augusta University from 2006 through spring 2021. During the Spring 2020 semester, several students complained that Crowther had sexually harassed them. While the University investigated those complaints, the chair of the Department of Art and Design issued Crowther a negative evaluation of his teaching and tried to negotiate his resignation. After the investigation found that Crowther had violated the University's sexual harassment policy, the University suspended his employment for one semester. Crowther appealed that decision through several channels to no avail. Before Crowther's appeal ended, the interim dean reassigned him to remedial tasks and refused to renew his contract for the 2021–2022 academic year.

Crowther later sued the Board of Regents of the University System of Georgia and several officials for sex discrimination and retaliation under Title IX and other provisions of federal law. He requested both damages and injunctive relief. The Board and officials moved to dismiss Crowther's complaint. The district court dismissed the claims against the officials but denied the motion to dismiss the claims against the Board under Title IX. The district court also certified the order for interlocutory appeal based on the question whether Title VII precludes claims for sex discrimination in employment brought under Title IX. *See* 28 U.S.C. § 1292(b). And we granted permission to appeal that order.

### B. MaChelle Joseph

MaChelle Joseph was the head women's basketball coach at Georgia Tech from 2003 until 2019. Joseph was responsible for coaching the team, recruiting new players, hiring and managing assistant coaches, and marketing the team and their games. The head men's basketball coach performed the same kinds of duties for the men's team. Georgia Tech provided practice and competition facilities, marketing budgets and resources, staffing, travel budgets, and other resources to both teams and coaches.

During Joseph's tenure, the men's basketball program consistently received more money and resources from Georgia Tech than the women's program. The women's locker room was smaller and had old and broken lockers, limited shower, laundry, and multipurpose space, and limited access to the practice facility. The men's facility had been updated with newer and more appliances and spaces and had direct access to the practice facility. The women's coaches' office space was smaller than the men's, requiring assistant coaches to share offices or sit at desks in a hallway. Joseph spent "substantial time" fundraising to improve the locker room and office conditions. Georgia Tech budgeted approximately $22,000 to the women's basketball team for marketing. That amount was insufficient to hire a full-time marketing professional, so Joseph had to dedicate other resources—including her own time—to market the team. The men's team had more funds and a full-time marketing professional. The Georgia Tech Athletic Association also paid the men's head coach for television and radio sets

during the season but did not pay Joseph for or provide parallel opportunities. Georgia Tech also provided less money for assistant coach and staff salaries for the women's team than for the men's team. And Georgia Tech provided less money for the women's team to travel than for the men's team.

Joseph learned about these differences during the 2006–2007 academic year and began to raise concerns about the disparity with Georgia Tech's Title IX coordinator for athletics. Nonetheless, most of the budgeting and resource issues remained unchanged throughout Joseph's career.

Joseph spent large portions of her time raising over $2 million for a locker room upgrade during the 2017–2018 year. Georgia Tech did not immediately proceed with the upgrade because addressing the practice facility access concerns—one of the primary issues with the women's locker room—required also changing the men's locker room. Georgia Tech considered upgrading both locker rooms simultaneously. But the men's team had not raised money for their own renovation, so the women's upgrade waited while the Athletic Department decided what to do.

As Joseph continued to complain about the various disparities to Athletic Department leadership, other and unrelated issues arose. For example, in 2015 Joseph was reprimanded for appearing intoxicated at a home football game. In 2016, Joseph's administrative assistant filed a complaint against her, which resulted in a written warning and corrective-action plan. Then in early 2018, the National Collegiate Athletic Association informed Georgia Tech that

it had received a report that Joseph or her staff paid recruits imper-
missible benefits. Meanwhile, Joseph and the team had not secured
a spot in the National Collegiate Athletic Association tournament
since 2014.

On November 21, 2018, Joseph sent a letter to Georgia
Tech's president, copying the athletic director and deputy athletic
director. That letter alleged that officials of the Athletic Depart-
ment had retaliated against Joseph because of her repeated com-
plaints about the disparate resources for her team and "differential
treatment of her as a female coach." The chief of staff for the pres-
ident of Georgia Tech testified that the athletic director appeared
"worn down" by Joseph's complaints about the women's basket-
ball team around that time.

Also in the fall of 2018, the personnel administrator for the
women's basketball team raised concerns about Joseph's treatment
of the team's staff. In early 2019, two staff members approached
Human Resources with complaints about Joseph's bullying. And in
January 2019, an interpersonal conflict arose among Joseph's play-
ers. That conflict eventually escalated to a meeting with the team's
personnel administrator and then with Georgia Tech's interim gen-
eral counsel. At the latter meeting, several players reported con-
cerns about Joseph's treatment of the athletes, expressing what the
general counsel called "genuine terror." The general counsel ad-
vised the players to have their parents file letters on their behalf to
initiate a formal investigation.

A few days later, the deputy athletic director informed the athletic director that he planned to resign because he could not deal with Joseph any longer. The athletic director responded that he had been "working on" a "path forward" regarding Joseph and discouraged the deputy from resigning. On February 7, 2019, the president instructed the athletic director to begin coordinating with human resources about the various staff complaints and resignation threats. The next day, apparently unrelatedly, Joseph filed a formal internal complaint of discrimination and retaliation. She raised the same concerns described above and alleged that the athletic director and others in the Department had retaliated against her.

Three days later, on February 11, the Athletic Department received a letter from the parent of a basketball player. The letter alleged that "Coach Jo and her staff" had isolated the player and created a "toxic" environment that impacted the player's "health and wellness." At some point, the athletic director received another letter from another player's parents. The athletic director and president discussed the contents of the letters, and the athletic director recommended hiring an attorney to investigate the allegations.

Around February 25, 2019, Georgia Tech hired an investigator for the various complaints about Joseph and the women's basketball program. Joseph first learned of the investigation on February 27 when she was placed on administrative leave, but she received no details about its subject matter. The athletic director communicated regularly with an assigned official from Georgia Tech about the ongoing investigation. That official recommended

people for the investigator to interview at Georgia Tech, but the investigator decided who he would contact. On March 11, the investigator delivered a preliminary report in a meeting, although he had not yet interviewed Joseph or the assistant coaches. After that meeting, the president's chief of staff texted the investigation point person, "Good meeting. We will have all we need." The chief of staff later clarified that the text stated that she believed that the Department would have sufficient evidence to take some kind of disciplinary action against Joseph.

On March 12, the investigator interviewed Joseph. On March 15, the investigator delivered an interim report of his findings. After reading that report, the chief of staff texted the general counsel expressing that she "hope[d] the final report ha[d] more details" because the interim report was "not as compelling as [she] had hoped." She again later clarified that she hoped that the final report would provide a "clear-cut case" for firing Joseph.

On March 20, the investigator submitted his final report. The final report revealed that the investigator had interviewed 13 current players, four former players, seven administrative staffers, five current assistant or graduate assistant coaches, three parents of current or former players, three consultants hired to work with the team during the 2018–2019 season, Coach Joseph, and four other individuals. The report found that the women's basketball players felt "insecure, nervous, anxious, and scared at various points in the season and in their careers," and described the team environment as "toxic," "suffocating," "draining and miserable," and

"unhealthy." Eleven of the thirteen current players interviewed "expressed concerns regarding player emotional and/or mental well-being." Players described Joseph "targeting" team members, engaging in "extreme cursing and yelling," and throwing items—possibly even at players. Staff members reported players experiencing "sleep disturbances" and "weight loss during particularly 'bad weeks' with the team." The report stated that Joseph used insulting and demeaning language "on a daily basis." For example, the report stated that Joseph called "a player a 'whore' and accus[ed] her of having sex with everyone on campus," and told "a player that she would be in jail if not for Coach Joseph." Players also reported "feeling manipulated by Coach Joseph," blamed for the team's poor performance, and isolated from their teammates.

The report found that it was "more likely than not that Coach Joseph's actions f[ell] outside acceptable behavior under the [University System of Georgia's] Ethics Policy," that the students were credible, and that "[e]very member of the team reported serious concerns regarding player mistreatment." The report stated that the players "attributed no [coaching] purpose" to the "bullying" and "verbal abuse." Staff corroborated the players' statements, but Joseph denied anything beyond yelling "on occasion" and "cursing in games, practices, and team meetings." The report deferred to Georgia Tech as to what action should be taken.

After receiving the report, the athletic director shared it with Joseph and allowed her to respond. She produced a 13-page response. It denied most if not all the allegations raised in the report,

including a line-by-line denial or defense of each of the specific name-calling allegations.

The athletic director fired Joseph on March 26, 2019. Joseph then filed a charge of discrimination with the Equal Employment Opportunity Commission in which she alleged sex discrimination and retaliation under Title VII. She obtained a right to sue letter, and she sued the Board of Regents, the Georgia Tech Athletic Association, and several individuals. She alleged against the Board and the Athletic Association two claims of sex discrimination under Title IX (counts 1 and 2), two claims of sex discrimination under Title VII (counts 3 and 4), and one count each of retaliation under Title IX, Title VII, and the Georgia Whistleblower Act (counts 9, 10, and 11). Joseph requested damages, declaratory judgments, and an injunction. The defendants removed the suit to the district court.

The defendants moved to dismiss and moved for judgment on the pleadings. The district court dismissed Joseph's claims of employment discrimination under Title IX as precluded by Title VII. It also narrowed Joseph's claims under Title VII based on the applicable limitations period and dismissed those claims insofar as they relied on a theory that Georgia Tech held her to a higher standard than her male colleagues. The district court also dismissed the claim under the Whistleblower Act as to the Athletic Association. After extensive discovery, the Board and the Athletic Association moved for summary judgment. The district court granted their motion.

### III. STANDARD OF REVIEW

We review *de novo* both a dismissal or refusal to dismiss (when interlocutory review is available) for failure to state a claim and a summary judgment. *See Williams v. Bd. of Regents of the Univ. Sys. of Ga.*, 477 F.3d 1282, 1291 (11th Cir. 2007); *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 919 (11th Cir. 2018); *S & Davis Int'l, Inc. v. Yemen*, 218 F.3d 1292, 1298 (11th Cir. 2000); *see also Akanthos Cap. Mgmt., LLC v. CompuCredit Holdings Corp.*, 677 F.3d 1286, 1293 (11th Cir. 2012).

### IV. DISCUSSION

We divide our discussion into four parts. First, we explain that Title IX does not provide Crowther or Joseph a private right of action for sex discrimination in employment. Second, we explain that Title IX does not provide Crowther a right of action for retaliation where he did not oppose an underlying violation. Third, we explain that Title VII does not provide Joseph a cause of action for the associational discrimination she alleged. Finally, we explain that because Joseph has not rebutted the proffered nondiscriminatory reasons for her termination, her claims of retaliation under Title VII, Title IX, and the Georgia Whistleblower Act fail.

*A. Title IX Does Not Provide a Private Right of
Action for Sex Discrimination in Employment.*

The parties ask us to decide whether the rights and remedies under Title VII preclude claims for employment discrimination under Title IX. Our sister circuits are split on that question. *Compare Lakoski v. James*, 66 F.3d 751, 753 (5th Cir. 1995) (finding preclusion

as to individuals seeking money damages under Title IX), *and Waid v. Merrill Area Pub. Schs.*, 91 F.3d 857, 862 (7th Cir. 1996) (same as to claims for equitable relief under Title IX or section 1983), *abrogated in part on other grounds by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 251 (2009), *with Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 560 (3d Cir. 2017) (finding no preclusion); *see also Vengalattore v. Cornell Univ.*, 36 F.4th 87, 92 (2d Cir. 2022) (holding that Title IX right of action was viable without deciding the preclusion question); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 896–97 (1st Cir. 1988) (same); *Preston v. Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994) (same); *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316–17 (10th Cir. 2017) (same). But Supreme Court precedent requires us to ask a more fundamental question: whether Title IX provides an implied right of action for sex discrimination in employment. We hold that it does not.

Whether express or implied, "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). When Congress fails to provide an express right of action, "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private *right* but also a private *remedy*." *Id.* (emphasis added). An intent to create a remedy is necessary "even where a statute is phrased in . . . explicit rights-creating terms." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002). And even when a statute "was intended to protect" a certain class, "the mere fact that the statute was designed to protect [that class] does not *require* the implication of a private cause of action . . . on their behalf." *Transamerica Mortg.*

*Advisors, Inc. v. Lewis*, 444 U.S. 11, 24 (1979) (emphasis added). "The dispositive question [is] whether Congress intended to create any such remedy." *Id.*; *see also Sandoval*, 532 U.S. at 286 ("Statutory intent . . . is determinative."). Without a clear indication of congressional intent to create a cause of action, "courts may not create one, no matter how desirable [a cause of action] might be as a policy matter, or how compatible with the statute." *Sandoval*, 532 U.S. at 286–87; *see also Gonzaga Univ.*, 536 U.S. at 280 ("[U]nless Congress speaks with a clear voice, and manifests an unambiguous intent to confer individual rights, federal funding provisions provide no basis for private enforcement." (alteration adopted) (citation and internal quotation marks omitted)).

Since the landmark decision in *Alexander v. Sandoval*, the Supreme Court has reminded inferior courts to exercise caution in implying rights of action. For example, in *Gonzaga University v. Doe*, the Court "reject[ed] the notion that [its] cases permit anything short of an unambiguously conferred right to support a cause of action." 536 U.S. at 276, 283 (considering whether Family Educational Rights and Privacy Act conferred a right that could be vindicated under section 1983). And in *Cummings v. Premier Rehab Keller, PLLC*, the Court circumscribed the remedies for implied rights of action under several statutes prohibiting discriminatory practices. 142 S. Ct. 1562, 1569–70, 1576 (2022) (holding "that emotional distress damages are not recoverable under the Spending Clause antidiscrimination statutes"). Where implied rights of action exist, we must honor them, but we cannot expand their scope without assuring ourselves that Congress unambiguously intended a right of

action to cover more people or more situations than courts have yet recognized.

Congress enacted Title IX under the Spending Clause and provided an express remedial scheme for withdrawing federal funding. *See* 20 U.S.C. § 1682. For most Spending Clause legislation, "'the typical remedy for . . . noncompliance with federally imposed conditions is not a private cause of action . . . but rather action by the Federal Government to terminate funds.'" *Gonzaga Univ.*, 536 U.S. at 280 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981)). When deciding whether an implied right of action exists under Spending Clause legislation, "our consideration of whether a remedy qualifies as appropriate relief must be informed by the way Spending Clause statutes operate: by conditioning an offer of federal funding on a promise by the recipient." *Cummings*, 142 S. Ct. at 1570 (citation and internal quotation marks omitted). Even where Spending Clause legislation is phrased in terms of the "persons" protected, the inclusion of a funding-based remedial scheme cautions against construing the statute to create other remedies. *See Gonzaga Univ.*, 536 U.S. at 284, 289 (noting that the conclusion that a Spending Clause statute did not confer enforceable rights was "buttressed by the mechanism that Congress chose to provide for enforcing [the statute's] provisions").

"Unlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent: 'in return for federal funds, the recipients agree to comply with federally imposed conditions.'"

*Cummings*, 142 S. Ct. at 1570 (alteration adopted) (quoting *Pennhurst*, 451 U.S. at 16, 17). But those conditions are binding only if they are clear and the "recipient voluntarily and knowingly accepts the terms of th[e] contract." *Id.* (alteration adopted) (citation and internal quotation marks omitted). The relevant terms of that "contract" include both the duties imposed and the liabilities created because "a prospective recipient would surely wonder not only what rules it must follow, but also what sort of penalties might be on the table." *Id.* So, if an implied right of action would impose unclear conditions or remedies for Spending Clause legislation, we should not recognize that right. *Id.* ("A particular remedy is . . . appropriate relief in a private Spending Clause action only if the funding recipient is *on notice* that, by accepting federal funding, it exposes itself to liability of that nature." (citation and internal quotation marks omitted)). And for a state recipient of federal funds, the clarity of the penalty is important because Title IX abrogates any recipient's sovereign immunity from claims for damages. *See* 42 U.S.C. § 2000d-7; *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985) (requiring that abrogation to be "unmistakably clear in the language of the statute").

The Supreme Court has held that Title IX provides an implied right of action for students who complain of sex discrimination by schools that receive federal funds. In *Cannon v. University of Chicago*, the Court held that section 901 of Title IX provided an implied right of action for a prospective student because "the language of the statute explicitly conferred a right directly on a class of persons that included the plaintiff in the case" and was "phrased

in terms of the persons benefited." 441 U.S. 677, 690 n.13, 692 (1979). *Cannon* concluded that the prospective student was clearly a member of an intended beneficiary class and that Congress intended Title IX not only to ferret out discriminatory uses of federal funding but also to protect individual students from discrimination. *Id.* at 680, 693–94, 709–10 (first interpreting Title IX, then considering the consequences for university admissions decisions).

In *Jackson v. Birmingham Board of Education*, the Supreme Court also held that Title IX provides a private right of action for *retaliation* for an employee's complaint about discrimination against students. 544 U.S. 167, 171 (2005). There, the male coach of a high school girls' basketball team complained that the school retaliated against him for complaining that the school discriminated against the girls' team. *Id.* at 171–72. The Court concluded that "the text of Title IX prohibits a funding recipient from retaliating against a person who speaks out against sex discrimination, because such retaliation is intentional 'discrimination' 'on the basis of sex.'" *Id.* at 178. The Court explained that the statutory goal of protecting students from discrimination "would be difficult, if not impossible, to achieve if persons who complain about sex discrimination did not have effective protection against retaliation" and that "teachers and coaches . . . are often in the best position to vindicate the rights of their *students*." *Id.* at 180–81 (emphasis added) (citation and internal quotation marks omitted).

Although the Supreme Court has reaffirmed *Cannon* several times, it has never extended the implied private right of action

under Title IX to claims of sex discrimination for employees of educational institutions. To be sure, Title IX empowers administrative agencies to promulgate and enforce regulations that require educational institutions to avoid sex discrimination against their employees. *See N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521, 535–36 (1982). The Supreme Court has held that because "[section] 901(a) neither expressly nor impliedly excludes employees from its reach," Title IX "cover[s] and protect[s]" employees through the statute's funding conditions structure. *Id.* at 521, 530 ("[E]mployment discrimination comes within the prohibition of Title IX."). But that federal funding might be contingent on an educational institution's treatment of its employees—or that an administrative agency could issue regulations imposing that contingency—has little bearing on whether Congress intended to create a private right of action for employees under Title IX. *Cf. Sandoval*, 532 U.S. at 290 (refusing to imply a right of action under the administrative enforcement provision of Title VI). To answer that question, we must look to congressional intent in creating "not just a private right but also a private remedy." *Id.* at 286. *Bell* considered only the administrative remedy evident on the face of Title IX, not any implied private right of action.

None of these Supreme Court precedents—*Cannon*, *Jackson*, or *Bell*—speak to whether Title IX created an implied right of action for sex discrimination in employment. And our sister circuits that have allowed claims of sex discrimination in employment under Title IX to proceed have failed to grapple with the inquiry required by *Sandoval* (and later *Gonzaga*); they instead have relied primarily

on *Bell* (and later *Jackson*) to hold that Title IX prohibits employment discrimination. *See, e.g.*, *O'Connor v. Peru State Coll.*, 781 F.2d 632, 642 n.8 (8th Cir. 1986); *Mabry v. State Bd. of Cmty. Colls. & Occup. Educ.*, 813 F.2d 311, 316–17 (10th Cir. 1987); *Lipsett*, 864 F.2d at 884 n.3, 896; *Preston*, 31 F.3d at 204 n.1, 205–06; *Waid*, 91 F.3d at 861; *Mercy Cath. Med. Ctr.*, 850 F.3d at 562; *Vengalattore*, 36 F.4th at 104–06; *see also Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1023 (9th Cir. 2018); *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 708 (6th Cir. 2022) (non-student, non-employee claims).

It is not enough to say that *Cannon* and *Jackson* recognized an implied right of action under Title IX or that *Bell* recognized that Title IX permits agencies to demand that recipients of federal funding avoid discriminating against employees based on sex. "Because the private right of action under Title IX is judicially implied, we have a measure of latitude to shape a sensible remedial scheme that best comports with the statute." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998). And when we consider whether a particular claim falls within the judicially implied right of action, we "examine the relevant statute to ensure that we do not fashion the scope of an implied right in a manner at odds with the statutory structure and purpose." *Cf. id.* So, to determine the appropriate scope of the implied right of action—and whether that scope includes employment discrimination—we look to the text of Title IX and its statutory context.

The text of Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from *participation in*, be denied the

*benefits of*, or be subjected to discrimination *under any education program or activity* receiving Federal financial assistance." Education Amendments of 1972, Pub. L. No. 92-318, § 901, 86 Stat. 235, 373 (June 23, 1972) (codified as amended at 20 U.S.C. § 1681) (emphasis added). True, the Supreme Court construed that language not to exclude employees from Title IX's administrative coverage. *See Bell*, 456 U.S. at 521, 530. But nothing about that language indicates congressional intent to provide a private right of action to employees of educational institutions. In other words, although there can be little doubt that Title IX's focus on educational institutions and programs represents an intent to provide students new protections from sex discrimination, *see Cannon*, 441 U.S. at 680, 693–94, 709–10, that connection is less obvious for employees.

Congress passed Title IX in June 1972 as part of a series of amendments to the Civil Rights Act of 1964 and other antidiscrimination statutes. The Equal Employment Opportunity Act of 1972 extended first Title VII's prohibition of employment discrimination to federal employees and educational institutions. Pub. L. No. 92-261, § 701–02, 86 Stat. 103, 103–04 (Mar. 24, 1972). That extension to educational institutions responded to "the widespread and compelling problem of invidious discrimination in educational institutions." *Univ. of Pa. v. Equal Emp. Opp. Comm'n*, 493 U.S. 182, 190 (1990). The amendment "expose[d]" employment decisions in educational institutions to the "same enforcement procedures applicable to other employment decisions" under Title VII—the "integrated, multistep enforcement procedure that enables the [Equal Employment Opportunity] Commission to detect and remedy

instances of discrimination." *Id.* (citation and internal quotation marks omitted). And Title IX extended next Title VI's protections against discrimination in federally funded programs to cover sex discrimination in educational institutions. Education Amendments of 1972, Pub. L. No. 92-318, § 901, 86 Stat. 235, 373 (June 23, 1972). But Title IX's enforcement mechanism relied on the carrot and stick of federal funding to combat sex discrimination.

Passed only three months apart, the 1972 amendments evince a congressional intent to create a comprehensive antidiscrimination remedial scheme. As amended, Title VII and Title IX work in tandem: "whereas Title VII aims centrally to *compensate* victims of discrimination, Title IX focuses more on protecting individuals from discriminatory practices carried out by recipients of *federal funds*." *Gebser*, 524 U.S. at 287 (emphasis added) (citation and internal quotation marks omitted); *see also Lakoski*, 66 F.3d at 757.

The two statutes accomplish these goals through different remedies. Title VII creates an administrative process that requires claimants first to file a charge of employment discrimination with the Equal Employment Opportunity Commission and then obtain a right to sue letter from the Commission before filing a complaint in a federal court. 42 U.S.C. §§ 2000e-4–2000e-5. Title IX, in contrast, empowers administrative agencies to condition federal funding on compliance with its anti-sex-discrimination mandate. 20 U.S.C. § 1682. Although it also provides an implied right of action for students—who would otherwise have no statutory remedy to

enforce their substantive right under Title IX—the terms of the statute do not embrace a private right of action for employees.

It is unlikely that Congress intended Title VII's express private right of action and Title IX's implied right of action to provide overlapping remedies. Judicially implied rights of action require expressions of congressional intent to create *both* a right *and* a remedy. *Sandoval*, 532 U.S. at 286. In the light of the complexity of Title VII's express remedial scheme, it would be anomalous to conclude that the implied right of action under Title IX would allow employees of educational institutions immediate access to judicial remedies unburdened by any administrative procedures. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 180 (1994) ("[I]t would be anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action." (citation and internal quotation marks omitted)); *cf. Gebser*, 524 U.S. at 289. That conclusion becomes even weaker when we remember that Congress extended Title VII's remedies to employees of educational institutions only three months before enacting Title IX. And because Title IX was enacted under the Spending Clause, it is dubious that recipients of federal funds would understand that they have knowingly and voluntarily accepted potential liability for damages for claims of employment discrimination under Title IX when those kinds of claims are expressly provided for and regulated by Title VII. *See Gebser*, 524 U.S. at 286–87 (distinguishing Title IX's "contractual framework" from

Title VII's express prohibition and limiting the scope of available remedies under Title IX).

We hold that Title IX does not create an implied right of action for sex discrimination in employment. We reverse the order denying the motion to dismiss Crowther's claim of employment discrimination under Title IX and remand with instructions to dismiss that claim. And we affirm the dismissal of Joseph's claims of employment discrimination under Title IX.

### B. Crowther's Retaliation Claim Based on His Participation in an Investigation of His Conduct Does Not State a Title IX Claim.

Although Crowther's case comes before us on interlocutory appeal, 28 U.S.C. § 1292(b), with a certified question concerning whether Title IX employment discrimination claims are precluded by Title VII, interlocutory jurisdiction under section 1292(b) "applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996). "[A]ny issue fairly included within the certified order" falls within our discretionary jurisdiction under section 1292(b). *Id.* So, we may also consider whether Crowther's allegation of retaliation for participating in the investigation of his conduct states a claim under Title IX. The Board asks us to hold that it does not. We agree.

*Jackson* defines the contours of a claim of retaliation under Title IX. The Supreme Court held that "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by

Title IX's private cause of action." 544 U.S. at 173. The Court linked the act of retaliation to a complaint of sex discrimination against students. *Id.* at 174, 180–81. Because Title IX's remedial scheme depends in large part on people being willing to report Title IX violations, those reporters are owed protection under the statute. *See id.* at 180–81.

*Jackson* does not contemplate protections for an accused discriminator who participates in a Title IX investigation of his own conduct. That situation bears none of the features of the *Jackson* implied right of action: it does not protect students, and it does not encourage reporters to come forward. It is unsurprising then that at least one other circuit has refused to recognize retaliation actions for participation in an investigation where the would-be plaintiff is accused of discrimination. *See Du Bois v. Bd. of Regents of the Univ. of Minn.*, 987 F.3d 1199, 1204–05 (8th Cir. 2021).

Crowther asks us to read *Jackson* too broadly. He contends that his Title IX retaliation claim survives even if his claim of employment discrimination does not because he alleges "retaliation." But Crowther's claim looks nothing like the right of action implied in *Jackson* because he seeks to protect only his participation in the Title IX investigation of complaints *against* him, not his reporting of other violations. Under the same logic regarding implied rights of action that we described above, we decline to extend *Jackson* in this way. *See Cummings*, 142 S. Ct. at 1576–77 (Kavanaugh, J., concurring) ("[W]ith respect to existing implied causes of action, Congress, not this Court, should extend those implied causes of action

and expand available remedies."); *Du Bois*, 987 F.3d at 1204–05. We reverse the order denying the motion to dismiss Crowther's retaliation claim under Title IX and remand with instructions to dismiss that claim as well.

### C. Title VII Does Not Cover Associational Claims Unrelated to the Employee's Sex.

Next, Joseph's complaint purports to allege two claims of sex discrimination under Title VII: one based on her sex and another based on her association with the women's basketball team. Joseph contends that the Board of Regents and the Athletic Association discriminated against her because she is a woman and because her players are women. But Joseph provides little to no explanation of how her allegations are connected to her sex, beyond a few conclusory statements that she was treated differently for failing to conform to sex-based stereotypes. Instead, for both her claims, she alleges resource disparities between the facilities, budget, and institutional support of the men's team and those of the women's team.

The district court granted summary judgment against Joseph's claims of sex discrimination under Title VII on the ground that she failed to produce evidence that *her* sex was the but-for cause of the resource disparity. On appeal, Joseph makes no argument that her claims of employment discrimination are based on her sex; instead—under a heading *purporting* to argue that her claims were based on her sex—Joseph focuses only on her association with the women's team. She contends that Title VII allows a

claim of discrimination based on an employee's association with a protected group, instead of the employee's sex.

Joseph relies on a line of "associational" cases under Title VII to support her argument that Title VII's prohibition covers discrimination based on an individual's association with a protected group. Under this theory, it does not matter whether Joseph is male or female. What matters is that the disparate treatment alleged was based on an associated person's sex.

Joseph's argument misconstrues the line of precedents that support associational claims. We defined the scope of these claims in *Parr v. Woodmen of the World Life Insurance Co.*, where a company refused to hire a white man because he was married to a black woman. 791 F.2d 888, 889 (11th Cir. 1986). We held that "[w]here a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of *his* race." *Id*. at 892. In other words, claims based on interracial association necessarily implicate the race of both the complainant and the associate. So, any discrimination based on that association is based on the race (or sex or religion or national origin) of both parties. *See Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1335 (11th Cir. 2021) (discussing *Parr* and its focus on the individual's protected trait in the context of a Florida statute). *Bostock v. Clayton County* confirms this interpretation. *See* 140 S. Ct. 1731, 1741 (2020) ("An *individual* employee's sex is not relevant to the selection, evaluation, or compensation of employees. . . . If the employer fires [a] male employee for no reason other

than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague." (emphasis added) (citation and internal quotation marks omitted)). And Joseph's evidence does not suggest that her sex mattered in association with the women's team. So, we affirm the summary judgment against Joseph's claims of sex discrimination under Title VII.

### D. Joseph's Claims of Retaliation Under Title VII, Title IX, and the Georgia Whistleblower Act Fail.

The parties agree that the common burden shifting framework applies to Joseph's claims of retaliation under Title VII, Title IX, and the Georgia Whistleblower Act. *See Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1344 (11th Cir. 2022). And we will assume that this framework applies here. Under the burden-shifting framework, "[t]he plaintiff must first make out a prima facie case of retaliation, showing (1) that she engaged in statutorily protected activity, (2) that she suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Id.* at 1344–45 (citation and internal quotation marks omitted). If the plaintiff satisfies her burden on those three elements, then "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason or reasons for the retaliation." *Id.* at 1345. If the employer provides legitimate reasons for taking adverse action against the plaintiff, then "the plaintiff must show that each reason is merely a pretext." *Id.* In sum, "a plaintiff must prove that had she not engaged in the protected conduct, she would not have been fired." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th

Cir. 2020) (en banc) (alteration adopted) (citation and internal quotation marks omitted).

Joseph alleges that she engaged in protected activity in her two letters to the Athletic Department. And she contends that Georgia Tech opened the investigation and fired her in sufficient proximity to those letters to raise an inference of causation. *See Patterson*, 38 F.4th at 1352 ("The general rule is that close temporal proximity between the employee's protected conduct and the adverse action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." (alteration adopted) (citation and internal quotation marks omitted)). The Board and Athletic Association responded to Joseph's allegations by producing evidence that Joseph's termination was instead based on the turmoil surrounding the women's basketball team and the findings in the investigation report. Because the pretext question is decisive, we assume that Joseph established a prima-facie case of retaliation.

To establish that an employer's reason for taking an adverse action is pretextual, a plaintiff must prove "that the reason was false." *Gogel*, 967 F.3d at 1136 (citation and internal quotation marks omitted). "At least where the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it." *Patterson*, 38 F.4th at 1352 (citation and internal quotation marks omitted). "A plaintiff cannot rebut a reason by simply quarreling with the wisdom of that reason or substituting her business judgment for that of the employer." *Id.* (citation

and internal quotation marks omitted). "The plaintiff instead must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* (citation and internal quotation marks omitted). At summary judgment, "it is the plaintiff's burden to provide evidence from which one could reasonably conclude that but for her alleged protected act, her employer would not have fired her." *Gogel*, 967 F.3d at 1136.

Joseph makes three arguments for pretext. None of them persuades us. We address each in turn.

First, Joseph contends that the athletic director had already decided to terminate her before launching the investigation. She argues that the athletic director's comments to his deputy that he had been "working on . . . a path forward," the president's chief of staff's impression that the athletic director intended to use the parents' letters to "negotiate" Joseph's resignation, and the speed with which the athletic director responded to the first parent letter—in contrast to a previous, self-reported allegation against the men's basketball coach—all point to a predetermined outcome of the investigation. But the athletic director clearly had a legitimate reason for initiating the investigation based on the parents' letters, and Joseph's suggestions to the contrary establish only that the letters arrived during administrative discussions about Joseph and the women's basketball team. *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1309 (11th Cir. 2023) (noting that an "intervening

discovery of misconduct [can] undercut[]" an inference of retalia-
tion). Moreover, the general counsel recommended conducting an
independent investigation, and the president approved that recom-
mendation. So, even if Joseph's evidence raised a genuine question
about the athletic director's motives, independent decisionmakers
agreed that the investigation was necessary.

Second, Joseph attacks the independence of the investiga-
tion and report. She contends that the athletic director "manipu-
lated the investigation" by selecting a "biased" official who recom-
mended witnesses that would criticize Joseph. But again none of
the evidence she points to supports her conclusion.

At most, the evidence suggests that the Athletic Department
supported the investigation and helped the investigator coordinate
witnesses and schedules. And Joseph offers no evidence that bias
infected either the investigation itself or the decision to fire her. *See
Pennington*, 261 F.3d at 1270 ("Where a decisionmaker conducts his
own evaluation and makes an independent decision, his decision is
free of the taint of a biased subordinate employee."). Indeed, the
athletic director testified that he did not "oversee the investiga-
tion," nor did he speak to the investigator before the investigation
began; instead, the general counsel's office handled coordination of
the investigation. That coordination is insufficient to raise an infer-
ence of manipulation that would undermine the legitimacy of the
investigation report.

Finally, Joseph argues that the athletic director did not hon-
estly believe that the report's conclusions warranted her

termination. Joseph attacks the athletic director's conclusion that the report conveyed that "the entire team" had complained about Joseph's conduct or the team environment. And Joseph asserts that the report's failure to provide the specific context for "certain words or actions" that interviewees had complained about raised an inference that the athletic director did not actually conclude that Joseph "engaged in inappropriate coaching practices." But the report provides multiple examples of inappropriate behavior, verbal abuse, and a toxic environment.

The report conveyed that "every [current] member of the team reported serious concerns regarding player mistreatment." That the report did not discuss every possible fact does not undermine its conclusion. *Cf. Berry*, 84 F.4th at 1309. The athletic director certainly could have believed that conclusion warranted Joseph's termination, and he testified that he did believe it. *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs."). Joseph points to no evidence suggesting that the athletic director—or any of the other decisionmakers involved—disbelieved the report's findings, and her arguments that the athletic director *should not* have believed the report do little more than "quarrel[] with the wisdom" of his belief. *See Patterson*, 38 F.4th at 1352 (citation and internal quotation marks omitted).

*Patterson* is instructive. There, the plaintiff offered evidence that created a material factual dispute that her employer's reliance on a deadline was a false reason for firing her and that her employer

did not follow its normal practices in investigating her absences from work. *Id.* at 1353. And, immediately before firing her, the plaintiff's employer told her that her description of her protected activity "made things clear" to him about her loyalty to the company. *Id.* at 1354 (internal quotation marks omitted). Those facts raised reasonable inferences of pretext.

In contrast, Joseph has produced no evidence that the behavior in the report was not actually against Georgia Tech policy or that the investigation and report did not involve many serious complaints. Even her brief discussion of a previous investigation of a self-reported accusation against the men's basketball coach proves nothing about the typical response to the kinds of complaints lodged against Joseph. Her strained inferences of a predetermined outcome, manipulation, and disbelief cannot rebut the Board's legitimate reasons for terminating her. We affirm the summary judgment against Joseph's claims of retaliation.

## V. CONCLUSION

We **AFFIRM** the judgment against Joseph's complaint.

We **REVERSE** the denial of the motion to dismiss Crowther's claims and **REMAND** with instructions to dismiss. **SO ORDERED.**